IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| OKECHUKWU DIMKPA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:19-CR-443 |
| | ) | 1:22-CV-770 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In 2019, Okechukwu Dimkpa, a medical doctor, pled guilty to six counts of distribution of oxycodone outside the usual course of professional practice as a physician and without a legitimate medical purpose, in violation of 21 U.S.C. § 841(a). He now moves to vacate his conviction based on the Supreme Court's decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022), contending he was not told before his guilty plea that it is an element of the crime that he have "knowingly or intentionally acted in an unauthorized manner."

Dr. Dimkpa did not raise this issue on direct appeal, and it is procedurally defaulted. Because Dr. Dimkpa has not shown cause and prejudice or actual innocence, he has not overcome this procedural default and his motion will be denied. But because the Fourth Circuit has not yet addressed procedural default in the *Ruan* context, a certificate of appealability shall issue.

## I. Offense Conduct

Dr. Dimkpa is a medical doctor who has practiced in hospitals in the United States for a number of years, including having his own practice in Kannapolis, North Carolina. *See, e.g.*, Doc. 12 at ¶¶ 3, 54–60.[1] In October 2016, the Drug Enforcement Administration received complaints that Dr. Dimkpa was over-prescribing oxycodone, a Schedule II controlled substance. *Id.* at ¶ 3. While investigating, the DEA heard from witnesses that Dr. Dimkpa "was prescribing opioids to known 'drug seekers' for cash with little or no physical examination." *Id.*[2]

One of Dr. Dimkpa's patients was Adam Cohen. *Id.* at ¶ 4. Mr. Cohen first saw Dr. Dimkpa in April 2014 seeking treatment for pain. *Id.* at ¶ 5. Dr. Dimkpa discussed the possibility of using the drugs Vivitrol or Suboxone as alternatives to oxycodone, but Mr. Cohen declined. *Id.* In August 2014, Mr. Cohen again visited Dr. Dimkpa, this time with his brother. *Id.* at ¶ 6. Mr. Cohen told Dr. Dimkpa that he was addicted to pain pills and that his brother, who ran a dental office in the area and employed Mr. Cohen, "was going to fire him if he did not stop using prescription opioids." *Id.* Dr. Dimkpa prescribed Suboxone to Mr. Cohen, which is designed to treat opioid addiction. *Id.* Dr. Dimkpa continued to prescribe Suboxone to Mr. Cohen for some four months. *Id.*

---

[1] The Court adopted Dr. Dimkpa's presentence report, Doc. 12, with some changes, Doc. 16 at 1, based on his objections. *See* Doc. 11. The Court does not cite to anything in the presentence report that was not adopted.

[2] The presentence report contained discussions of other patients that tended to support this characterization of Dr. Dimkpa's practice. *See* Doc. 12 at ¶¶ 13–17. The Court struck those paragraphs, as there were "no corroborated incidents of the defendant prescribing opioids" to other patients "outside appropriate medical practice." Doc. 16 at 1.

2

In January 2015, with knowledge that Mr. Cohen was addicted to opioids, Dr. Dimkpa prescribed oxycodone to Mr. Cohen. *Id.* at ¶¶ 6–7. He continued to prescribe oxycodone to Mr. Cohen until August 2016, even after Mr. Cohen routinely tested positive for heroin and cocaine. *Id.* at ¶¶ 4, 6–7. He last prescribed oxycodone to Mr. Cohen on August 23, 2016. *Id.* at ¶¶ 6–7. Mr. Cohen died on August 28, 2016, of "Acute Combined Drug Toxicity." *Id.* at ¶ 4.

According to Dr. Gene S. Kennedy, who reviewed Mr. Cohen's medical chart for investigators, Dr. Dimkpa never requested Mr. Cohen's past medical records and never conducted a creditable physical exam, and Dr. Dimkpa's medical records contained no support for a chronic pain diagnosis. *Id.* at ¶ 20.[3] Dr. Kennedy said that continuing to prescribe oxycodone after Mr. Cohen tested positive for cocaine and heroin was "without rationale, well outside the course of normal medical practice, and not medically legitimate." *Id.* (cleaned up).

## II. History of the Proceedings

On August 23, 2019, Dr. Dimkpa was charged via information with six counts of distribution of oxycodone, based on six times he wrote prescriptions for Mr. Cohen after Mr. Cohen tested positive for cocaine and/or heroin. Doc. 1; Doc. 2 at 3. Later that month, the parties filed a signed plea agreement, Doc. 3, and on September 11, 2019, Dr.

---

[3] Dr. Dimkpa objected to these conclusions, *see* Doc. 11, Doc. 14, and argued that he was treating Mr. Cohen, a patient struggling with chronic pain, as best as he could. He further contended that he did request Mr. Cohen's past medical records but could not obtain them. Doc. 11 at 3. Dr. Dimkpa has not provided a transcript of the sentencing hearing, but it appears from the Statement of Reasons that the Court overruled these objections and adopted the part of the PSR containing Dr. Kennedy's conclusions as recited here. *See* Doc. 16 at 1.

3

Dimkpa pled guilty to all six counts pursuant to that plea agreement. Minute Entry 09/11/2019; Doc 3.

At the Rule 11 change of plea hearing, the following colloquy occurred between the Court and Dr. Dimkpa:

> THE COURT: Okay. Dr. Dimkpa, you've been charged with six counts of unlawful distribution of oxycodone. The elements of this offense are—I'm just going to tell you the elements once, and then we'll go through the dates separately for each count, okay. The elements are that you knowingly or intentionally caused to be distributed a quantity of a mixture or substance containing a detectable amount of oxycodone, a Schedule II controlled substance, knowing that at the time you intended to distribute the mixture, and you did so outside the usual course of professional practice. Do you understand those elements?
> THE DEFENDANT: Yes, Your Honor.
> . . .
> THE COURT: If you plead not guilty and go to trial, the Government has to prove all of those things beyond a reasonable doubt. If you plead guilty, you're admitting each and every one of those things. Do you understand?
> THE DEFENDANT: Yes, Your Honor.

Doc. 34 at 12–14. The Court then listed the dates of the offenses but again did not address the knowledge requirement. *Id.* at 13. Later in the hearing, Dr. Dimkpa admitted his guilt to all six charges of unlawful distribution. *Id.* at 18–19.

On December 16, 2019, the Court sentenced Dr. Dimkpa to 46 months in prison followed by three years of supervised release. Minute Entry 12/16/2019; Doc. 15 at 2–3. He self-reported to prison on January 27, 2020, Doc. 15 at 2, and did not appeal.

In May 2022, Dr. Dimkpa was released from the custody of the Bureau of Prisons. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Mar. 1, 2023). He is now serving his three-year term of supervised release.

4

### III. *Ruan* and the Pending Motion

In June 2022, the Supreme Court examined the elements of the same crime to which Dr. Dimkpa pled guilty and the specific part of that statute concerning drug distribution by medical professionals. 21 U.S.C. § 841(a). The Supreme Court first quoted and summarized the statutory language:

> A provision of the Controlled Substances Act, codified at 21 U.S.C. § 841, makes it a federal crime, "*except as authorized*, . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance," such as opioids. Registered doctors may prescribe these substances to their patients. But, as provided by regulation, a prescription is only authorized when a doctor issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice."

*Ruan v. United States*, 142 S. Ct. 2370, 2374–75 (2022) (cleaned up).

The specific question at issue was whether it was "sufficient for the Government to prove that a prescription was *in fact* not authorized," or whether the Government must "prove that the doctor *knew* or *intended* that the prescription was unauthorized." *Id.* at 2375 (emphasis in original). The Court held that "§ 841's 'knowingly or intentionally' *mens rea* applies to the 'except as authorized' clause. This means that once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at 2376.

Shortly after the Supreme Court's decision in *Ruan*, Dr. Dimkpa sought vacatur of his conviction. Doc. 27. The Court directed the government to respond, Doc. 28, and briefing is now complete.

5

## IV. Discussion

A federal prisoner may challenge a sentence imposed by a federal court if: (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).[4] A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (cleaned up). "This standard is only satisfied when a court is presented with exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015) (cleaned up).

Dr. Dimkpa contends that he was not told when he pled guilty that it is an element of this crime that he knew he was acting in an unauthorized manner or that he intended to act in an unauthorized manner. *See Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022). Because the Court did not explicitly tell Dr. Dimkpa about this element when he pled guilty, *see* Doc. 34 at 12–14, he says his guilty plea was not knowing and voluntary.[5] He

---

[4] A motion for relief under 28 U.S.C. § 2255 must normally be brought within one year of the date that the petitioner's judgment became final; there are narrow exceptions, *see* 28 U.S.C. § 2255(f), one of which the government says applies here. *See* Doc. 32 at 3–4. Courts do not usually raise timeliness issues *sua sponte*, and no reason appears to consider it here in light of the government's implicit waiver. *See generally Wood v. Milyard*, 566 U.S. 463, 472–73 (2012).

[5] Because omission of the *mens rea* element from the plea colloquy "does not affect the entire framework within which the proceeding occur[ed]," automatic reversal is not required, even on direct appeal. *Greer v. United States*, 141 S. Ct. 2090, 2100 (2021).

6

also says that the government's evidence was insufficient to prove his guilt. *See* Doc. 27 at 2.

Dr. Dimkpa's claim is procedurally defaulted. If raised by the government, a claim is procedurally defaulted and subject to dismissal if it could have been made on direct appeal but is raised for the first time in post-conviction proceedings. *See Bousley v. United States*, 523 U.S. 614, 621 (1998). Such is the case here, as Dr. Dimkpa did not file a direct appeal and the government has raised the procedural default. *See* Doc. 32.

"Two showings excuse a procedural default: a defendant's demonstration of 'either cause and actual prejudice or that he is actually innocent.'" *United States v. McKinney*, __ F.4th ___, 2023 WL 2028440, at *3 (4th Cir. 2023) (citing *Bousley*, 523 U.S. at 622). Dr. Dimkpa's argument that the government did not have a factual basis for the guilty plea does not meet this test; the evidence summarized in the presentence report, Doc. 12, and the government's proffer, Doc. 2, easily support an inference that Dr. Dimkpa knew his acts were inappropriate. *See* Doc. 12 at 25. But his argument about his guilty plea requires closer consideration.

### A. Cause and Prejudice

To demonstrate actual prejudice on collateral review of a guilty plea, a defendant must show it is likely that "had he known of the error" he "would not have pled guilty." *McKinney*, 2023 WL 2028440, at *6.[6] As to the involuntariness of his guilty plea, Dr.

---

[6] In *McKinney*, the Fourth Circuit cited the test established in *United States v. Dominguez Benitez*, 542 U.S. 74 (2004), a direct appeal.

7

Dimkpa has made a strong showing of prejudice. His sentencing materials were largely directed to his argument that he had treated Mr. Cohen as a person with complex medical needs including chronic pain and addiction, *see* Doc. 14, implicitly contending he had not known the prescribing of oxycodone to someone using heroin and cocaine was inappropriate if that person had other legitimate medical needs supporting the prescription. That is what Dr. Dimkpa says now, *see e.g.*, Doc. 37 at 8, and it is consistent with what was presented earlier in this case. Dr. Dimkpa probably would not have pled guilty if he had realized the government would have to prove that he knew the distribution of oxycodone was inappropriate. *See McKinney*, 2023 WL 2028440, at *6.

But prejudice alone, without good cause, is not sufficient to overcome the procedural default. And Dr. Dimkpa has not shown good cause.

"Generally, the existence of cause for procedural default turns on whether some objective factor external to the defense prevented counsel from raising the claim on direct appeal." *McKinney*, 2023 WL 2028440, at *3 (cleaned up). Dr. Dimkpa states that he did not previously raise this issue, on appeal or otherwise, because it was "not available" until June 2022 when the Supreme Court decided *Ruan*. Doc. 27 at 13–14.

A change in the law constitutes "cause" only if "a constitutional claim [was] so novel that its legal basis [was] not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984); *see also McKinney*, 2023 WL 2028440, at *3. "[A]lleged futility cannot serve as 'cause' for a procedural default in the context of collateral review . . . if it means simply that a claim was unacceptable to that particular court at that particular

8

time." *Whiteside v. United States*, 775 F.3d 180, 185 (4th Cir. 2014) (en banc) (citing *Bousley*, 523 U.S. at 623).

Dr. Dimkpa cannot demonstrate that the argument was not reasonably available at the time of his guilty plea. Dr. Dimkpa's argument had not been foreclosed by the Supreme Court, *see Ruan*, 142 S. Ct. at 2381 (noting that a past case discussing this general issue "did not directly address . . . the *mens rea* required to convict under the statute"), and defendants continued to raise these challenges. *See, e.g.*, *United States v. Purpera*, Nos. 18-CR-19, 19-CR-16, 2020 WL 5237521, at *3 (W.D. Va. Sept. 2, 2020) (appeal pending). Indeed, the Supreme Court had been persuaded by defense arguments addressing the knowledge requirement in another statute just a few months before Dr. Dimkpa's guilty plea.[7] This argument was reasonably available to Dr. Dimkpa. *See Bousley*, 523 U.S. at 623; *Whiteside*, 775 F.3d at 185; *cf. Reed*, 468 U.S. at 16.

### B. Actual Innocence Following a Guilty Plea

A claim of actual innocence can also overcome procedural default. *See McKinney*, 2023 WL 2028440, at *2–3. To prevail on actual innocence, Dr. Dimkpa must establish that, in light of all the evidence available, "it is more likely than not that no reasonable juror would have convicted him" of any charge. *Bousley*, 523 U.S. at 623.

---

[7] On June 21, 2019, just a few months before Dr. Dimkpa's guilty plea on September 11, 2019, the Supreme Court examined whether the word "knowingly" in 18 U.S.C. § 924(a)(2) modified and applied to the requirement that a person have a status that makes it a crime to possess a firearm. *Rehaif v. United States*, 139 S. Ct. 2191 (2019). The Court held that it did. *Id.* at 2195–2197 (so holding, noting that "[t]he cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion" and collecting cases).

9

Dr. Dimkpa has not demonstrated actual innocence. He has not filed any additional evidence to support this claim, and the facts in the record support the opposite finding. *See* Doc. 2 at 3–4 (showing that Dr. Dimkpa prescribed oxycodone to Mr. Cohen on multiple occasions "despite the fact that [Mr. Cohen] had just tested positive for heroin and/or cocaine" and that an expert concluded that this conduct was "outside the course of usual medical practice" and "not medically legitimate"); Doc. 12 at ¶¶ 4, 7–8, 20 (same); *id.* at ¶ 20 (expert statements that Dr. Dimkpa never requested Mr. Cohen's past medical records or conducted a "creditable physical exam"); *id.* at 25 (addendum to the presentence report in which the Probation Officer stated that "[t]he indicia of [Mr.] Cohen's addiction and abuse clearly reflects the defendant knew or had reason to know that the prescriptions he issued beginning on January 29, 2015, were for illegitimate purposes or were not within the scope of usual medical practice. Furthermore, the fact that [Mr.] Cohen had legitimate medical problems is not sufficient to reflect that the defendant prescribed medications in good faith").

Dr. Dimkpa did file written and chronological summaries of Mr. Cohen's medical treatment before sentencing, *see* Docs. 11-1 and 11-2, that generally show that Mr. Cohen complained of chronic pain to Dr. Dimkpa. *See, e.g.*, Doc. 11-1 at 2–4, 7; Doc. 11-2 at 13–15, 35–36. He contended at his sentencing hearing that he had prescribed oxycodone to Mr. Cohen in an effort to help him with his chronic pain issues after making a "medical assessment," Doc. 14 at 4, recognizing that if he did not prescribe oxycodone Mr. Cohen was likely to return to street drugs such as heroin. *See id.* at 5–6.

But Dr. Dimkpa knew Mr. Cohen was a drug addict who wanted pain medicine because of his addiction; Mr. Cohen's brother told him so. Doc. 12 at ¶ 6; *see also* Doc. 14 at 4 (Dr. Dimkpa's sentencing memorandum acknowledging this fact). And he knew that despite the oxycodone prescriptions, Mr. Cohen was using cocaine and heroin. *See, e.g.*, Doc. 11-2 at 29 (Dr. Dimkpa's medical records showing Mr. Cohen tested positive for cocaine); *id.* at 31 (same); *id.* at 16 (same for heroin metabolite); *id.* at 20 (same); *see also* Doc. 14 at 5, 9. He knew that Mr. Cohen was not following his recommendations to seek treatment from a long-term pain management specialist. Doc. 14 at 5. Yet he continued to prescribe oxycodone over a span of nineteen months. *See* Doc. 12 at ¶¶ 6–7.

The inference that Dr. Dimkpa knew prescribing these medicines was not appropriate is strong. Even assuming that a jury might credit the evidence that Mr. Cohen was experiencing ongoing pain and presented complex issues because of his addiction, Dr. Dimkpa has presented no evidence that any other medical professional would have considered it to be appropriate medical care to continue to prescribe oxycodone to an addict known to be using heroin and cocaine. A rational juror would be skeptical of Dr. Dimkpa's assertion that he did not know this was unauthorized. Those assertions, on their own, are not enough to show that it is more likely than not that no reasonable juror would have convicted him of any of his six charges. *See Bousley*, 523 U.S. at 623.

## V. Conclusion

Dr. Dimkpa's claim for collateral relief is procedurally defaulted. Because he has not established cause or actual innocence, his motion to vacate will be denied.

11

The Court is aware of no published case by the Fourth Circuit addressing the application of either the cause-and-prejudice exception or the actual-innocence exception to the procedural default of an involuntary guilty plea argument in the *Ruan* context. In *McKinney*, __ F.4th __, 2023 WL 2028440 (4th Cir. 2023), the Fourth Circuit recently addressed procedural default of a claim of an involuntary guilty plea in the § 2255 context, but that case concerned acts which were no longer a crime because of changes in the case law, a quite different situation than here. Dr. Dimkpa has raised a substantial question about how the Supreme Court's decision in *Ruan* affects procedurally defaulted claims, and this issue may impact his constitutional rights concerning a knowing and voluntary guilty plea. Therefore, the Court will issue a certificate of appealability so that the appellate court can evaluate the case and determine whether the procedural default rule has been appropriately applied here, should Dr. Dimpka appeal.

**IT IS THEREFORE ORDERED AND ADJUDGED** that:

1. The petitioner's motion to vacate, set aside, or correct sentence, Doc. 27, is **DENIED**.

2. The Court issues a certificate of appealability.

This the 3rd day of March, 2023.

_____
UNITED STATES DISTRICT JUDGE